UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

DANIEL BERNER,

        Plaintiff,

JAMES LAPP,

        Plaintiff,

   -against-

GETTY IMAGES HOLDINGS, INC.,

        Defendant.

---

24-cv-4483 (JSR)
24-cv-5129 (JSR)

OPINION AND ORDER

JED S. RAKOFF, U.S.D.J.:

Plaintiffs Daniel Berner and James Lapp held warrants to purchase shares of defendant Getty Images Holdings, Inc. pursuant to a Warrant Agreement. Following Getty's alleged failure to allow them to exercise their warrants in accordance with the Warrant Agreement, Berner and Lapp separately sued Getty for breach of contract. The Court consolidated the two actions through the close of discovery and plaintiffs jointly moved for summary judgment. In a Bottom-Line Order, this Court ruled in favor of plaintiffs. See Case No. 24-cv-4483, ECF No. 43; Case No. 24-cv-5129, ECF No. 40. This Opinion explains the reasoning for that ruling. Upon entry of this Opinion, judgment shall issue in favor of plaintiffs, as outlined below.

I.    Background

    A. Factual Background

        i. The Business Combination and Warrants

CC Neuberger Principal Holdings II ("CCNB"), a special purpose acquisition company ("SPAC"), became a public company through an initial public offering ("IPO") on August 4, 2020. See Case No. 24-cv-4483, ECF No. 36 ("Defendant's Counterstatement to Plaintiffs' 56.1 Statement") at ¶ 8. Defendant Getty Images Holdings Inc. ("Getty") combined with CCNB on July 22, 2022 ("Business Combination"). See id. at ¶ 2. In connection with its IPO, CCNB sold 82,800,000 "units," each of which was comprised of one Class A ordinary share of CCNB and one-fourth of one CCNB public warrant ("Warrant") at an exercise price of $11.50. See id. at ¶¶ 8-9, 14. The shares and Warrants traded separately on the New York Stock Exchange ("NYSE") following the IPO. See id. at ¶ 12.

The Warrants, which were custodied by the Depository Trust Company ("DTC"), were issued pursuant to a warrant agreement between CCNB and Continental Stock Transfer & Trust Company, the transfer agent for the Warrants, that was dated August 4, 2020 ("Warrant Agreement"). See Defendant's Counterstatement at ¶¶ 13, 93. The Warrant Agreement, which is governed by New York law, provided that the Warrants would become exercisable "thirty days after the first date on which [CCNB] complete[d] a merger . . . or

other similar business combination involving [CCNB] and one or more businesses (a "Business Combination")" so long as both of the following two conditions were met: (1) "a registration statement under the Securities Act with respect to the Ordinary Shares underlying the Public Warrants [was] then effective" and (2) "a prospectus relating thereto [was] current, subject to [CCNB's] satisfying its obligations under [the Warrant Agreement], or a valid exemption from registration [was] available." Case No. 24-cv-4483, ECF No. 33-5 ("Warrant Agreement") at §§ 3.2, 3.3.2.

The Warrant Agreement also placed certain responsibilities on CCNB. Section 7.4.1 required CCNB to use "commercially reasonable efforts" to file "as soon as practicable, but in no event later than twenty (20) Business Days after the closing of its initial Business Combination" a "registration statement for the registration, under the Securities Act, of the Ordinary Shares issuable upon exercise of the Warrants." Id. at § 7.4.1. It also required CCNB to "use commercially reasonable efforts to cause the same to become effective within sixty (60) Business Days after the closing of its initial Business Combination and to maintain a current prospectus relating thereto." Id.

On January 18, 2022, CCNB filed a registration statement on a Form S-4 through its newly formed merger subsidiary, Vector Holding. See Defendant's Counterstatement at ¶ 25. The Form S-4 included a proxy statement, which served both as a statement for

the CCNB stockholder vote on the Business Combination and a prospectus for the shares that would be registered for the Business Combination. See id. at ¶ 27; see also Case No. 24-cv-4483, ECF No. 33-8 ("Vector Form") at 4-7. That form referred to Getty as the "New CCNB" and its stock as "New CCNB Class A common stock." Defendant's Counterstatement at ¶ 28; see also Vector Form at 1-2. The Form S-4 also registered several categories of securities, including "39,260,000 shares of New CCNB Class A Common Stock, issuable upon exercise by holders of New CCNB Warrants following the completion of the Business Combination." Vector Form at 3. The registration fee table in the Form S-4 calculated a registration fee of $41,853.12 for the 39,260,000 shares of "New CCNB Class A Common stock underlying [the] warrants." Id. at 2. On April 22, 2022, CCNB filed a Form S-4/A, which reiterated this information. See Case No. 24-cv-4483, ECF No. 33-9 at 16-17.

On June 27, 2022, CCNB filed an amended Form S-4. See Defendant's Counterstatement at ¶ 32. That filing included an opinion by CCNB's counsel, which stated: "This opinion is being rendered in connection with the registration under the above-referenced Registration Statement of . . . 39,260,000 New CCNB Warrants and . . . 39,260,000 Warrant Shares." Case No. 24-cv-4483, ECF No. 33-10 at 2. The SEC declared the Form S-4 effective on June 30, 2022, and Getty filed a final prospectus the following day. See Defendant's Counterstatement at ¶¶ 36-37.

When the Business Combination closed on July 22, 2022, the Warrants became exercisable for Getty's Class A Common Shares and Getty assumed all of CCNB's rights and obligations under the Warrant Agreement. See id. at ¶¶ 38-40. At that time, the American Stock and Transfer Company, LLC ("AST") assumed the role of warrant agent. See id. at ¶ 41. Getty then filed an SEC Form 8-K, which included various pieces of information related to the Business Combination. See Case No. 24-cv-4483, ECF No. 33-1.

Following the Business Combination, Getty's share price rose considerably. On July 25, 2022, Getty's common stock and Warrants began publicly trading on the NYSE with an opening price of $9.39 per share. See Defendant's Counterstatement at ¶ 44. By July 29, 2022, the price per share closed at $26.15. See id. at ¶ 45. And, by August 2, 2022, Getty's common stock was trading above $33.00 per share -- far above the $11.50 exercise price. See id. at ¶ 47.

On August 9, 2022, Getty filed an SEC Form S-1. See id. at ¶ 48; see also Case No. 24-cv-4483, ECF No. 33-18 ("Form S-1"). In that form, Getty registered new securities that were not included in either the Form S-4 or the Form S-4/A, including shares issued to former Getty stockholders in relation to the Business Combination and the secondary offering of private placement warrants. See Defendant's Counterstatement at ¶ 48. The Form S-1 also stated that "39,260,000 shares of Class A Common Stock" were "previously registered on a registration statement on Form S-4"

that were "declared effective on June 30, 2022" and were "being transferred from the [Form S-4] pursuant to Rule 429(b) under the Securities Act." Form S-1, Exhibit 107 at 1 n.5. The Form S-1 therefore provided that "[i]f securities previously registered under the [Form S-4] [were] offered and sold before the effective date of this registration statement," then "the amount of previously registered securities so sold [would] not be included in the prospectus hereunder." Id.

> ii.    Berner Purchases and Attempts to Exercise Warrants

Plaintiffs Daniel Berner and James Lapp are individual investors, see Defendant's Counterstatement at ¶¶ 3-4, who separately purchased thousands of Warrants, see id. at ¶¶ 52, 80.

Between July 29, 2022 and August 22, 2022, Berner purchased 280,312 Warrants. See id. at ¶ 52. On July 29, 2022, after purchasing several thousand Warrants, Berner emailed the Investor Relations Department of Getty and Getty's Chief Executive Officer, Craig Peters, to confirm the earliest date that he could exercise them. See Case No. 24-cv-4483, ECF Nos. 33-21, 33-22. Peters responded that the Warrants could not be exercised "until the later of 30 days from closing and the date that the underlying shares are registered on a Form S-1 or other applicable registration statement" and that Getty "expect[ed] to register issuance of the shares underlying warrants on a Form S-1 in the coming weeks." Id.

at 2. Berner did not understand Peters's email to exclude the possibility that the Warrant Shares were registered on the Form S-4, so he believed that he would be able to exercise his Warrants within thirty days of the Business Combination on August 22, 2022. Accordingly, Berner added an appointment to his calendar spanning from August 22, 2022 to August 24, 2022 to exercise his Warrants 30 days after the Business Combination. See Case No. 24-cv-4483, ECF No. 33-23 ("Convert GETY/WS 8/22 or 24 is 30 days").

In the weeks that followed, Berner prepared to exercise his Warrants. On August 4 and 5, 2022, he spoke with representatives from Charles Schwab ("Schwab"), his broker, about his intention to exercise them on August 22, 2022. See Case No. 24-cv-4483, ECF No. 33-54 ("Berner Declaration") at ¶ 10. A few days later, on August 10, 2022, Berner similarly spoke with his account manager at Schwab, Daniel Gil, about his intentions. See id. at ¶ 11. The following day, Berner spoke with an AST representative to "express [his] intent to exercise the Warrants at the earliest possible time." Id. at ¶ 12. Immediately after that call, Berner emailed Gil to discuss his conversation with the AST representative and to detail the process of exercising the Warrants. See Case No. 24-cv-4483, ECF No. 33-24. Finally, on August 18, 2022, Berner spoke with yet another Schwab representative, who told him that his Warrants would not be exercisable until Schwab received

exercisability information from AST. See Berner Declaration at ¶ 14.

Despite Berner's efforts and intentions, he never issued a formal notice of exercise or made any exercise payments. See Case No. 24-cv-4483, ECF No. 39 ("Plaintiffs' Counterstatement to Defendant's Statement of Additional Facts") at ¶¶ 185-86. Moreover, the parties dispute whether Berner had enough funds to cover the exercise price of the Warrants. On the one hand, Berner argues that, on August 22, 2022, he "held ample funds" to exercise the Warrants because he had over $3,433,000.00 in cash and liquid securities in his linked accounts. See Defendant's Counterstatement at ¶ 68. On the other hand, Getty argues that, as of August 31, 2022, Berner had only $767,939.65 across his accounts and that he "did not move funds to the accounts containing his Warrants and did not liquidate any securities to be able to pay the exercise price on August 22, 2022." Id. The parties also dispute the amount of money Berner had access to in his other accounts and in cryptocurrency. See id. at ¶ 69.

In any event, the parties agree that, come August 22, 2022, Berner had no means of exercising his Warrants. He nevertheless purchased 4,011 additional Warrants that same day. See id. at ¶¶ 64-65, 67. In the days that followed, he placed multiple calls to AST to discuss how and when he could exercise them. See id. at ¶¶ 70-71. During a call on August 23, 2022, AST told Berner that

the matter needed to be investigated further because its records indicated that his Warrants were exercisable. See id. at ¶ 70. During a second call on August 24, 2022, AST explained that while the Warrants should have been exercisable, DTC had not made them eligible for exercise. See id. at ¶ 71.

Berner began selling his Warrants on August 24, 2022, and sold all but one of them by September 7, 2022. See id. at ¶¶ 73, 127.[1]

### iii. Lapp Purchases and Attempts to Exercise Warrants

Lapp, an experienced SPAC securities trader, began purchasing CCNB public Warrants on October 26, 2021. See id. at ¶ 75. By August 22, 2022, he held 91,330 Warrants. See id. at ¶ 80.

Lapp knew from prior experience that when an issuer authorizes the exercise of its Warrants, it typically also provides notice of exercise to its DTC participants, including his broker Fidelity Investments ("Fidelity"). See id. at ¶ 87. He also knew that Fidelity would post messages on its client portal when it received such notices so that its clients could submit their exercise instructions. See id. Lapp therefore expected that Fidelity would post a message on its portal and thereby enable him to exercise his Warrants after Getty provided notice. See id.

---

[1] Although Berner purchased additional Warrants on September 1, 2022, see Defendant's Counterstatement at ¶ 123, he sold all but one of them on September 7, 2022, see id. at ¶¶ 127, 191.

On July 18, 2022, Lapp emailed Getty to confirm when his Warrants would be exercisable. See Case No. 24-cv-4483, ECF No. 33-31 at 5. Getty responded on July 29, 2022, stating that the warrants could not be exercised "until the later of 30 days from closing and the date that the shares underlying the [W]arrants [were] registered on a Form S-1 or other applicable registration statement, which the Company expect[ed] to do in the coming weeks." Id. at 4. On August 18, 2022, in response to another inquiry from Lapp, Getty repeated that the Form S-1 would need to be declared effective before Lapp would be able to exercise his Warrants. See id. at 3.

In both text messages and posts on X, Lapp indicated that he understood that it was rare for companies to allow for the exercise of their warrants without an effective Form S-1. See Defendant's Counterstatement at ¶ 88. However, Lapp nevertheless believed that Getty was obligated to authorize the exercise of its Warrants on August 22, 2022 and held out hope that he would be able to do so on that date. See id. In preparation, Lapp checked the Fidelity portal every trading day between July 29, 2022, and August 22, 2022. See id. at ¶ 89. However, like Berner, Lapp never filed a notice of exercise or tendered the exercise price. See Plaintiffs' Counterstatement at ¶¶ 123-25.

When August 22, 2022 came and went without a post on the portal, Lapp understood that Getty would not allow him to exercise

his Warrants on that date. <u>See</u> Defendant's Counterstatement at ¶¶ 90-91. Between August 22 to August 23, 2022, he proceeded to sell all of his Warrants. <u>See</u> <u>id.</u> at ¶ 91.

iv.  Getty Insiders Benefit

While plaintiffs were unable to exercise their Warrants, Getty insiders benefitted. On August 26, 2022, Getty announced that it had issued 59 million "earnout shares," for no additional consideration, to Getty Insiders -- the SPAC sponsor and Getty's directors, officers, and 10% shareholders -- because its stock remained above the specified threshold prices for twenty or thirty consecutive trading days. <u>See</u> <u>id.</u> at ¶ 117.

At the opening of the next trading day, August 29, 2022, the price of Getty's shares began to fall, but public Warrant holders were still unable to exercise their Warrants. <u>See</u> <u>id.</u> at ¶ 118. By contrast, private placement warrant holders were able to exercise their private placement warrants. For instance, Neuberger Berman Group and Chinh Chu later disclosed that they had been able to exercise their 18,560,000 warrants for 11,555,996 shares of Getty common stock on August 29, 2022. <u>See</u> <u>id.</u> at ¶ 119.

After the close of trading on September 15, 2022, the SEC deemed the Form S-1 effective and Getty allowed public Warrant holders to exercise their Warrants for the first time. <u>See</u> <u>id.</u> at ¶ 130. By that time, Getty's stock price had fallen to $8.49, well below the $11.50 exercise price. <u>See</u> <u>id.</u> at ¶ 132. Between

September 19, 2022 (when Getty notified public Warrant holders that it would redeem all outstanding Warrants for $0.01 each on October 19, 2022) and October 19, 2022 (when the Warrants stopped trading), Getty's stock price continued to fall and never again reached $11.50. See id. at ¶¶ 133-35.

### v.    Alta Partners

In October 2022 and February 2023, two other Warrant holders, Alta Partners LLC ("Alta Partners") and CRCM Institutional Master Fund (BVI) Ltd. ("CRCM"), sued Getty. As relevant here, Alta Partners and CRCM alleged that Getty had breached the Warrant Agreement by preventing them from exercising their Warrants on August 22, 2022. See Alta Partners, LLC v. Getty Images Holdings, Inc., 700 F. Supp. 3d 32, 39 (S.D.N.Y 2023). Those cases were consolidated through the close of discovery in February 2023 and in September 2023 all parties moved for summary judgment. See id.

The Court granted summary judgment to Alta Partners and CRCM on their breach of contract claim,[2] holding that: (1) the Form S-4 registered the shares underlying the Warrants, see id. at 40-43; (2) the corresponding prospectus was current as of August 22, 2022, see id. at 40-44; (3) the Exercise Date was, therefore, August 22, 2022, see id. at 43-44; and (4) under New York law,

---

[2] While the Court granted summary judgment to Alta Partners and CRCM on their breach of contract claim, it granted summary judgment to Getty on all of the other claims. See Alta Partners, 700 F. Supp. 3d at 48.

plaintiffs were entitled to damages in the amount of the difference between the exercise price and the market price of Getty stock on the Exercise Date, which was calculated as the mean between the highest and lowest quoted selling prices, see id. at 41-45. The Court also limited plaintiffs' damages to "those for warrants they acquired before, and actually sought to exercise at the time of, Getty's breach." Id. at 45.

Getty has since appealed the Court's Alta Partners decision. To date, that appeal remains pending.

### B. Procedural Background

Following this Court's decision in Alta Partners, Berner and Lapp filed separate suits against Getty. On June 11, 2024, Berner filed suit raising three breach of contract claims and a Securities Act claim. See Case No. 24-cv-4483, ECF No. 1 ("Berner's Complaint"). First, Berner alleged that Getty had breached the Warrant Agreement by preventing him from exercising his Warrants on the Exercise Date. Second, he alleged, in the alternative, that Getty had breached section 7.4.1 of the Warrant Agreement by failing to use commercially reasonable efforts to cause the Warrant Shares to be registered as soon as practicable. Third, he alleged, also in the alternative, that Getty had breached section 7.4.1 of the Warrant Agreement by failing to use commercially reasonable efforts to maintain a current prospectus. And fourth, he alleged that Getty had violated Section 11 of the Securities Act by failing

to disclose that the Warrant Shares were not registered on the Form S-4. The Court dismissed the Section 11 claim with prejudice pursuant to its one-year statute of limitations. See Case No. 24-cv-4483, ECF No. 23.

On July 5, 2024, Lapp filed suit raising only two claims. First, like Berner, he alleged that Getty had breached the Warrant Agreement by contending that the Warrants could only become exercisable upon the effectiveness of the Form S-1 and refusing to permit him to exercise his Warrants on the Exercise Date on that basis. Second, he alleged, in the alternative, that Getty had breached the covenant of good faith and fair dealing by engaging in the same conduct.

Both plaintiffs have calculated their damages using the same formula that the Court employed in Alta Partners based on the mean market price of Getty images common stock on August 22, 2022, which was $28.975. Berner argues that he is entitled to $4,695,499.00 plus interest. On August 22, 2023, Berner held 280,312 Warrants. The market price of those Warrants -- minus the cost of exercising them -- was therefore $4,596,991.00. Berner also asks the Court to account for an additional loss of $98,508.00 that he incurred by selling his Warrants to mitigate damages, to reach a grand total of $4,695,499.00. Lapp argues that he is entitled to $1,497,595.00 plus interest. On August 22, 2022, Lapp held 91,330 Warrants. The market price of his Warrants -- minus the cost of exercising them

14

-- was $1,506,446.00. Lapp asks the Court to subtract $8,870.00[3] from that amount to account for the profit he earned by selling his Warrants to mitigate damages, arriving at a grand total of $1,497,595.00. As discussed below, Getty disputes these damages calculations on various grounds.

The Court consolidated these cases for pretrial purposes on August 9, 2024. See Case No. 24-cv-4483, ECF No. 18. On November 14, 2024, plaintiffs filed a joint motion for summary judgment on their respective breach of contract claims. See Case No. 24-cv-4483, ECF No. 31. After holding oral argument on December 20, 2024, the Court requested supplemental briefing, which concluded on January 2, 2025. See Case No. 24-cv-5129, ECF No. 37. On January 24, 2025, this Court issued a Bottom-Line Order granting plaintiffs' motion for summary judgment. See Case No. 24-cv-4483, ECF No. 43; Case No. 24-cv-5129, ECF No. 40.

---

[3] In plaintiffs' 56.1 Statement, they state that Lapp earned $8,793.00 from selling his Warrants to mitigate his damages, arriving at a grand total of $1,497,673.00 in damages. See Case No. 24-cv-4483, ECF No. 24 at ¶ 158. However, both in plaintiffs' brief in support of their motion for summary judgment and in Lapp's expert report on damages, plaintiffs state, without objection from Getty, that the amount that Lapp earned was $8,870.00, arriving at a grand total of $1,497,595.00. See Case No. 24-cv-4483, ECF No. 32 at 27; Case No. 24-cv-4483, ECF No. 33-17 at 12. The Court is unaware of any additional references to the $8,793.00 figure in the record. Accordingly, the Court understands the reference to the $8,793.00 figure in the plaintiffs' 56.1 Statement to be a typographical error and finds that the correct figure is $8,870.00.

## II.  Legal Standard

A party is entitled to summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In evaluating the record, the Court "constru[es] the evidence in the light most favorable to the non-moving party and draw[s] all reasonable inferences in [its] favor."[4] Williams v. N.Y.C. Hous. Auth., 61 F.4th 55, 68 (2d Cir. 2023). The Court must enter "summary judgment against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." El-Nahal v. Yassky, 835 F.3d 248, 252 (2d Cir. 2016).

## III. Discussion

Plaintiffs argue that this case is squarely governed by this Court's earlier decision in Alta Partners and that collateral estoppel applies, so that all that the Court must do to resolve their motion for summary judgment is calculate a new damages award based on the number of Warrants that Berner and Lapp held on the August 22, 2022. Getty insists that collateral estoppel does not apply either to the Court's determinations on the merits or to its

---

[4] Unless otherwise indicated, all case quotations omit internal alterations, brackets, citations, ellipses, emphases, quotations, and quotation marks.

method for calculating damages and that this case raises genuine
issues of material fact in any event with respect to plaintiffs'
performance under the Warrant Agreement and their efforts (or lack
thereof) to mitigate damages. The Court discusses these issues in
turn, starting with the merits of plaintiffs' claims and then
turning to damages.

A. Merits

i. Collateral Estoppel

Collateral estoppel "preclude[s] a defendant from
relitigating an issue the defendant has previously litigated and
lost to another plaintiff." Faulkner v. Nat'l Geographic Enters.
Inc., 409 F.3d 26, 37 (2d. Cir. 2005) (citing Parklane Hosiery Co.
v. Shore, 439 U.S. 322, 329 (1979)). Under here applicable New
York law, collateral estoppel applies where "(1) the identical
issue was raised in a previous proceeding, (2) the issue was
actually litigated and decided in the previous proceeding, (3) the
losing party had a full and fair opportunity to litigate the issue,
and (4) the resolution of the issue was necessary to support a
valid and final judgment on the merits." Seneca Nation v. Hochul,
58 F.4th 664, 668 (2d Cir. 2023).

As discussed above, in Alta Partners this Court conclusively
resolved several of the issues that Getty raises in this case,
each of which was necessary to support a valid and final judgment
on the merits in that case. Specifically, this Court held that

(1) the Form S-4 registered the shares underlying the Warrants, Alta Partners, 700 F.Supp.3d at 40-43; (2) the corresponding prospectus was current as of August 22, 2022, id. at 40-44; and (3) the Exercise Date was, therefore, August 22, 2022, id. at 43-44.

There can be no question that Getty had a full and fair opportunity to litigate each of those issues. Indeed, in reaching its conclusions as to those issues, this Court considered and explicitly rejected the very same arguments that Getty raises again here, including: (1) whether the Form S-1 registered the shares underlying the Warrants, id. at 41-42; (2) whether the corresponding prospectus was current as of September 15, 2022, id. at 43-44; and (3) whether the Exercise Date was, therefore, September 16, 2022. Those arguments were first developed following extensive discovery and motions practice in Alta Partners, including no less than three motions for summary judgment. And, given that Getty similarly faced a multi-million-dollar damages calculation in Alta Partners, it had every incentive to raise and develop those arguments in that case. Under these circumstances, the Court does not hesitate to conclude that collateral estoppel applies with respect to the conclusions on the merits outlined above.

Getty nevertheless argues that collateral estoppel does not apply to those determinations for three primary reasons, none of

which is persuasive. First and foremost, Getty argues that Berner
and Lapp seek to apply collateral estoppel to questions of law,
rather than questions of fact or mixed questions of law and fact.
The Court disagrees. Whether the Form S-4 registered the shares
underlying the Warrants, whether the prospectus was current as of
August 22, 2022, and whether the Exercise Date was August 22, 2022
clearly qualify as mixed questions of law and fact, not questions
of law, so the Court's corresponding determinations may
appropriately be subject to collateral estoppel.

Second, Getty argues that collateral estoppel does not apply
because Berner and Lapp chose not to participate in the Alta
Partners action. On this record, it is not clear that plaintiffs
were aware of the Alta Partners action before it was decided.
However, even assuming that they were aware of it and that it was
not adverse to their interests,[5] the Second Circuit has long
rejected the argument that a litigant's decision not to join an
initial action serves as a sufficient basis to bar the application
of collateral estoppel. See Central Hudson Gas & Electric Corp. v.
Empresa Naviera Santa S.A., 56 F.3d 359, 370 (2d Cir. 1995).
Moreover, collateral estoppel is a discretionary doctrine, which

---

[5] In Alta Partners, the plaintiff argued that individual traders
who sold their warrants, like Berner and Lapp, thereby lost their
right to sue for breach of contract. Accordingly, even if Berner
and Lapp had been aware of the Alta Partners suit, it is not clear
that they would have been able to participate as co-plaintiffs.

this Court may apply as it deems appropriate. See Parklane, 439 U.S. at 331. Given that this case involves the same defendant (Getty), contract (the Warrant Agreement), right (to exercise Warrants on the Exercise Date), misconduct (failure to permit exercise on the Exercise Date), and cause of action (breach of contract), the Court determines that applying collateral estoppel would be both consistent with this Court's decision in Alta Partners and promote fairness and efficiency. Accordingly, the Court concludes that Berner and Lapp's decision not to join the Alta Partners action does not preclude the application of collateral estoppel in this case.

Third, Getty argues that Berner and Lapp seek to apply collateral estoppel to issues that were not actually litigated in Alta Partners, namely whether Berner and Lapp actually sought to exercise their Warrants on the Exercise Date and mitigated damages. It is correct that insomuch as Alta Partners did not concern or involve Berner or Lapp's specific actions in connection with their Warrants or the Warrant Agreement, Getty is not estopped from raising arguments with respect to such conduct. But that does preclude the application of collateral estoppel to issues not affected by such conduct. Accordingly, having concluded that collateral estoppel applies with respect to the three conclusions that this Court reached on the merits in Alta Partners, the Court

proceeds to consider Getty's arguments concerning Berner's and Lapp's actions leading up to the Exercise Date.

　　ii. Performance

In this regard, Getty primarily argues that the Court should deny the motion for summary judgment because there are genuine issues of material fact as to whether Berner and Lapp performed under the Warrant Agreement by seeking to exercise their Warrants on August 22, 2022. The Court is not persuaded. As elaborated below, the record makes clear that both Berner and Lapp sought to exercise their Warrants on that date. Moreover, even assuming that they did not sufficiently demonstrate that they sought to exercise their Warrants on August 22, 2022, Getty does not dispute that it prevented them from doing so, so they are entitled to summary judgment in any event.

Starting with Berner, the record is clear that Berner sought to exercise his Warrants on August 22, 2022. In Berner's Declaration, he states that he "started accumulating Warrants with the intention to exercise them at the earliest possible time," which he understood to be August 22, 2022. Berner Declaration at ¶ 6. To that end, Berner added an appointment to his calendar to "Convert GETY/WS" for August 22, 2022. Id. Shortly thereafter, he contacted Getty to confirm that the Exercise Date was August 22, 2022. Id. Although Getty eventually responded that the Warrants could not be exercised until a Form S-1 was effective, Berner

continued to believe that the Warrants could be exercised on August 22, 2022, thirty days after the Business Combination. Id. at ¶¶ 8-9. Starting on August 4, 2022, and continuing through August 18, 2022, Berner consistently communicated his intention to exercise his Warrants and sell his Warrant Shares on August 22, 2022, to both AST and Schwab. See id. at ¶¶ 10-14. None of these facts are disputed by Getty.

Turning to Lapp, while there is less record evidence of Lapp's efforts to exercise his Warrants on August 22, 2022, the effectively undisputed facts nonetheless demonstrate that he also sought to exercise his Warrants on that date. During his deposition, Lapp testified repeatedly that he monitored the Fidelity portal continuously to determine whether Fidelity had posted an exercise notice about his Warrants and that he intended to exercise them on August 22, 2022, irrespective of Getty's representations to him about the Form S-1. See, e.g., Case No. 24-cv-4483, ECF No. 33-34 at 286:23-287:15. Getty insists that the Court should deny summary judgment to Lapp because he has not put forth any concrete evidence to support his testimony about the portal. However, as the party opposing summary judgment, Getty may not "deny [plaintiffs'] allegations in a general way." McKinney v. City of Middletown, 49 F.4th 730, 738 (2d. Cir. 2022). Instead, Getty "must present competent evidence that creates a genuine issue of material fact." Id.; see also Robinson v. Sanctuary Record

Grps., 826 F. Supp. 2d 570, 574 (S.D.N.Y. 2011) ("The party opposing summary judgment must come forward with materials setting forth specific facts showing that there is a genuine issue of material fact; the opposing party cannot defeat summary judgment by relying on allegations in the complaint, conclusory statements, or mere assertions that affidavits supporting the motion are credible.").

To that end, Getty insists that there is "substantial record evidence that [Lapp] would not have exercised all of his Warrants." 24-cv-5129, ECF No. 37 at 2 (emphasis added). Getty points to Lapp's acknowledgment that Getty had informed him that a Form S-1 would be required to register the Warrants, his decision to purchase additional Warrants after August 22, 2022, and his expectation that the price of Getty stock would fall after the Warrants became exercisable. See id. According to Getty, "a jury should assess the credibility of [his] current claim that he would have risked a substantial portion of his net worth . . . on the Warrants while simultaneously harboring the belief that the price of the common stock he would receive would immediately have fallen." Id. at 2-3. However, none of the evidence that Getty identifies actually demonstrates that Lapp did not seek to exercise his Warrants on August 22, 2022. Therefore, on this record, there is no genuine dispute of material fact that both plaintiffs sought to exercise their Warrants on August 22, 2022.

Moreover, even assuming that there were a genuine issue of material fact as to whether Berner and Lapp sought to exercise their Warrants on August 22, 2022, the prevention doctrine applies. Similar to the implied covenant of good faith and fair dealing, the prevention doctrine "rests on an implied obligation under [a] contract not to frustrate or prevent the performance of [a] condition precedent." OKL Holdings, Inc. v. Abercrombie & Fitch Stores Inc., 223 A.D. 3d 476, 477 (1st Dep't 2024); see also Consolidated Edison, Inc. v. Northeast Utilities, 426 F.3d 524, 528 (2d Cir. 2005) (discussing the prevention doctrine). "Thus, a party to a contract cannot rely on the failure of another to perform a condition precedent where he has frustrated or prevented the occurrence of the condition." OKL Holdings, Inc., 223 A.D. at 477; see also 3 RICHARD A. LORD, WILLISTON ON CONTRACTS § 39.3 (4th ed. 2000 & 2009 Supp.) ("[I]f one party to a contract hinders, prevents, or makes impossible performance by the other party, the latter's failure to perform will be excused.").

Here, there is no dispute that Getty prevented the plaintiffs from exercising their Warrants on August 22, 2022. Because the Warrants were custodied by DTC, they could only be exercised through DTC's procedures.[6] See Defendant's 56.1 Statement at ¶ 104.

---

[6] Indeed, the Warrant Agreement specifies that the Warrants must be exercised in accordance with DTC procedures. See Warrant Agreement § 3.3.1.

Pursuant to those procedures, Getty or AST must have sent DTC an Issuer Notice with the Exercise Date so that DTC could advise its participants, including plaintiffs' brokers, of its terms. Id. at ¶¶ 114, 109-110. DTC did not receive an Issuer Notice prior to August 22, 2022, so plaintiffs' brokers did not have notice of the Exercise Date. Id. at ¶¶ 112-13, 64, 90. Indeed, DTC did not receive notice that the Warrants were exercisable until the evening of September 15, 2022. Id. at ¶ 109. DTC then allowed participants to submit notices of exercise the following day, on September 16, 2022. Id. at ¶¶ 109-115. Getty thus prevented plaintiffs from exercising their Warrants on the Exercise Date, as required under the Warrant Agreement.

Accordingly, because the record demonstrates that Berner and Lapp sought to exercise their Warrants on the Exercise Date and in any case that Getty prevented them from doing so, there is no genuine dispute of material fact as to plaintiffs' performance.

iii. Mitigation

Finally, Getty argues that there are genuine issues of material fact with respect to mitigation. Specifically, Getty argues that Berner and Lapp knew, based on their communications with Getty, that they would not be able to exercise their Warrants on August 22, 2022, and that they nevertheless purchased Warrants both before and after that date, thereby violating their duty to mitigate their damages. Plaintiffs respond that Getty's

communications did not clearly indicate that they would be unable to exercise their Warrants on August 22, 2022. And although they may have had a duty to mitigate their damages _after_ the Exercise Date, they did not have a duty to mitigate their damages _before_ the Exercise Date, which is what they are seeking to recover in this case.

The plaintiffs have the better argument. As the record makes clear, Getty's communications with the plaintiffs focused on the Form S-1 and specified that it would be filed in the coming weeks. Given that the Warrants would not be exercisable until the registration form -- whether the Form S-4 or the Form S-1 -- became effective, it may well have been clear to a sophisticated investor, like Berner or Lapp, that the Warrants would not be exercisable on August 22, 2022. However, Getty did not explicitly state that the Warrants would not be exercisable on that date. Under these circumstances, Getty's communications did not constitute a clear repudiation.

In any event, plaintiffs have raised breach of contract claims, not anticipatory repudiation claims. Even if Getty's communications had constituted a repudiation of the Warrant Agreement, plaintiffs would still have had the option to proceed as if the Warrant Agreement were still in force and file suit at a later time. As the Second Circuit has explained, "[w]hen confronted with an anticipatory repudiation, the non-repudiating

party has two mutually exclusive options." Lucente v. Int'l Bus. Machines Corp., 310 F.3d 243, 258 (2d Cir. 2002). "He may (a) elect to treat the repudiation has an anticipatory breach and seek damages for breach of contract, thereby terminating the contractual relation between the parties, or (b) he may continue to treat the contract as valid and await the designated time for performance before bringing suit." Id. Here, plaintiffs arguably pursued the second course. And, as discussed in greater detail below, in filing suit after August 22, 2022, they seek only those damages that they sustained for the Warrants they obtained before that date. Under these circumstances, the Court rejects Getty's mitigation-related arguments.

*   *   *

For the foregoing reasons, the Court concludes that there is no genuine dispute of material facts that Getty breached the Warrant agreement by preventing both Berner and Lapp from exercising their Warrants on the Exercise Date.[7]

---

[7] For the first time, Getty argues in its briefing of this motion, that the filing of the Form S-1 on August 4, 2022 rendered the Form S-4 ineffective, so that no registration statement was effective on August 22, 2022. See Case No. 24-cv-4483, ECF No. 30 at 28-29. Specifically, Getty argues that, pursuant to SEC Rule 429, the filing of a new registration statement with a combined prospectus requires that sales under the original registration statement stop until the SEC approves the new statement and it becomes effective. The Court is not persuaded. Rule 429 provides that "[w]here a registrant has filed two or more registration statements, it may file a single prospectus in the latest registration statement in order to satisfy the requirements of the

B. Damages

As this Court explained in Alta Partners, "damages for breach of contract should put the plaintiff in the same economic position he would have occupied had the breaching party performed the contract." Alta Partners, 700 F. Supp. 3d at 44 (quoting Boyce v. Soundview Tech. Grp., Inc., 464 F.3d 376, 384 (2d Cir. 2006)). "As a result, under New York law, 'the measure of damages' for failing to deliver a stock in accordance with an option or warrant agreement 'is the difference between the option price and the market value of the stock.'" Id. (quoting Boyce, 464 F.3d at 385). "[A] plaintiff need only show a stable foundation for a reasonable estimate of the damages incurred as a result of the breach" and "the burden of any uncertainty as to the amount of damages is on the breaching party." Id. at 45 (quoting Process Am., Inc. v. Cynergy Holdings, LLC, 839 F.3d 125, 141 (2d Cir. 2016)).

_____

[Securities] Act" and that where a registrant does so "the registration statement containing the combined prospectus shall act, upon effectiveness, a post-effective amendment to any earlier registration statement whose prospectus has been combined in the latest registration statement." 17 C.F.R. §§ 230.429(a) & (b) (emphasis added). The plain text of Rule 429 thus makes clear that an initial prospectus is suspended "upon effectiveness" of a new prospectus, not upon its filing. Here, the Form S-1 was declared effective on September 15, 2022, so the Form S-4 remained effective until that time. Separately, Getty also argues that the Warrant Agreement is ambiguous, see id. at 29-30, but, based on the detailed analysis outlined in Alta Partners, the Court disagrees. The Court therefore declines to disturb its earlier determination that the Exercise Date was August 22, 2022.

Like the plaintiffs in Alta Partners, Berner and Lapp calculate damages "at the time of the breach" by subtracting, for each Warrant they sought to exercise on August 22, 2022, the exercise price of $11.50 from the market price of a Getty share. Id. at 44. (quoting Boyce, 464 F.3d at 385). "Consistent with New York law, they calculate the market price of a Getty share on the intended exercise date as 'the mean between the highest and lowest quoted selling prices.'" Id. (quoting Boyce, 464 F.3d at 385). To ensure that the measure of damages puts them in the "same economic position" they would have occupied if Getty had allowed them to exercise their Warrants on the Exercise Date, they then ask the Court to add any losses they sustained (in the case of Berner) or subtract any gains they reaped (in the case of Lapp) by selling the Warrants they held on the Exercise Date on a later date. Accordingly, plaintiffs ask the Court to award $4,695,499.00 for Berner and $1,497,595.00 for Lapp, plus interest.

As in Alta Partners, Getty does not dispute the number of Warrants that plaintiffs held on the Exercise Date, the exercise price, or the market price of Getty stock on the Exercise Date. Nor does Getty disagree with plaintiffs' technical calculations. Instead, Getty once again argues that the market price of Getty stock on the Exercise Date did not reflect its actual value because of trading restraints that resulted in a period of anomalous, inflated pricing. This Court rejected that same argument in Alta

Partners, reasoning that it "conflate[d] the abstract notion of a share's intrinsic value with what is actually used to calculate damages" and that "upward movement in share price in response to a disclosure merely shows an informed market at work." Id. at 44-45. And, even assuming that market price is not an appropriate metric where the value of a stock is "artificially inflated by fraud and improprieties or other relevant facts of which the marketplace did not have reasonable knowledge," the Court concluded that Getty had "fail[ed] to create a genuine dispute, let alone show, that any fraud and improprieties or other relevant facts" had "affected its stock price." Id. at 44.

Like the Court's determinations on the merits, the Court's determination as the appropriate method of calculating damages and its rejection of Getty's market value argument concern mixed questions of law and fact that are entitled to collateral estoppel. Getty disagrees, pointing to record evidence demonstrating that both Berner and Lapp expected that the Getty stock price would fall below the exercise price when the Warrants became exercisable and that they believed that the price was distorted by the stock's low float. Of course, the current plaintiffs' opinions on the value of Getty stock and the status of the market were not part of the record in Alta Partners. However, those opinions are irrelevant to the Court's selection of the appropriate method for calculating

damages.[8] As discussed above, the appropriate method is simply "the difference between the option price and the market value of the stock.'" Id. (quoting Boyce, 464 F.3d at 385). What matters, then, for calculating damages is the actual exercise price of the Warrants and the actual market price of Getty stock on the Exercise Date -- not the views of particular Warrant holders on what those prices were or should have been at that time.

In any event, even if collateral estoppel did not apply to the Court's damages determination, Getty has once again failed to create a genuine dispute of material fact that any fraud, improprieties, or other relevant facts unknown to the public artificially inflated Getty's stock price. Indeed, Getty's damages expert did not find that any such dynamics existed in the market. See Defendant's Counterstatement at ¶ 160. Instead, Getty's damages expert argues that Getty's stock price became inflated due to the low float of Getty stock. See id. However, even assuming that Getty's expert is correct, Getty fails to identify any controlling authority requiring the Court to deviate from its standard damages calculation methodology under such circumstances.

---

[8] Moreover, in Alta Partners, the Court specifically considered and rejected a similar argument that "rumors" and "speculation" regarding a short squeeze warranted a different calculation, concluding that they were "not the stuff of which genuine disputes are made." Alta Partners, F. Supp. 3d at 45.

Accordingly, the Court will employ the same method for calculating damages in this case as it did in Alta Partners.

As a last-ditch effort to manufacture a dispute of material fact, Getty suggests, in a footnote, that August 22, 2022, is not the appropriate date from which to calculate damages. According to Getty, "there is a question of fact regarding how long it would have taken Plaintiffs to receive the common stock after providing exercise instructions to their brokers." Case No. 24-cv-4483, ECF No. 35, at 20 n.11. That assertion is belied by the record, which demonstrates that Berner and Lapp would have received their shares on the same day that their brokers submitted exercise instructions on their behalf. See Case No. 24-cv-4483, ECF Nos. 33-35 at 1, 33-59 at ¶¶ 3 & 5. And, as discussed above, there is no meaningful dispute that they both sought to exercise their Warrants on August 22, 2022.

For all of these reasons, the Court adopts the plaintiffs' damages calculations in full.

V. Conclusion

As outlined above, the Court grants plaintiffs' motion for summary judgment on their breach of contract claims. The Clerk of Court is hereby directed to enter judgment for plaintiffs in the amount of $4,695,499.00 for Berner and $1,497,595.00 for Lapp, plus prejudgment interest for both plaintiffs to be calculated by the Clerk of Court at a rate of 9% per annum beginning on August

32

22, 2022.[9] The Clerk of Court is further directed close both cases,

Case Nos. 24-cv-4483 and 24-cv-5129.

    SO ORDERED.

New York, NY

_8/6_, 2025

                                       JED S. RAKOFF, U.S.D.J.

---

[9] Under New York law, prejudgment interest is added to "a sum awarded because of breach of performance of a contract," N.Y. C.P.L.R. § 5001(a), "at the rate of nine percent per annum," id. § 5004. "The date from which interest is to be computed shall be specified" in the Court's "decision." Id. § 5001(c). Prejudgment interest begins to accrue for both Berner and Lapp on August 22, 2022, because that is the date they intended and were unable to exercise their Warrants because of Getty's breach of the Warrant Agreement.